LETTY M. CLARK, Plaintiff in Error, *v.* BUCKNER S. MORRIS, *et al.,* Defendants in Error.

ERROR TO COOK COUNTY COURT OF COMMON PLEAS.

A party who sets up a claim to real estate, founded upon an unrecorded deed, from a brother, must show such facts as were sufficient to put any one upon inquiry who was dealing with the estate. Negligence in giving notice to those to whom it was known the estate was about to be conveyed, might amount to an estoppel.

The fact of possession by such a party must be considered, in connection with all the circumstances surrounding it; as to who was the head of the family; how far the conveyance was kept concealed; the motives for the conveyance; the consideration, and all the incidents affecting the transaction.

THE opinion of the court, contains a full statement of the case, condensed from a very voluminous record, which it is not deemed necessary to present, otherwise than as it is there presented.

R. S. BLACKWELL, and GOOKINS, THOMAS & ROBERTS, for Plaintiff in Error.

B. S. MORRIS, for Defendants in Error.

BREESE, J. We cannot but admire and approve the brief and pointed manner in which one of the counsel for plaintiff in error states this case. From a very voluminous record, he extracts four points only, as worthy the consideration of this court, and when considered, such will be found to be the fact.

The points are: 1st, That complainant was in possession of the property in question at the time of the execution of the trust deed by Lewis W. Clark to Burch, the trustee of Corning, under an unrecorded deed from Lewis W. Clark, her brother, and if this was true, Burch the trustee and Corning the *cestui que trust*, had notice, in equity, of the complainant's rights. Second, If Lewis W. Clark and complainant were both in possession, then it was a mixed possession, and the law in such case is, that the possession shall be adjudged to the party having the

right—that complainant had the right, and consequently it was her possession, and this possession put the trustee and *cestui que trust* upon inquiry which constitutes notice in equity of the unrecorded deed to the complainant. Third, The recital in the deed of a pecuniary consideration and the support of the father and mother of the grantor and grantee, cannot be contradicted by loose hearsay, and fourth, If the unrecorded deed be invalid as against the trustee and *cestui que trust*, the complainant has a right to redeem from the trust deed.

These are the grains of wheat winnowed by diligence from the superfluous matter with which the case is encumbered, and which is the fortune of all cases in chancery where large values are involved.

We think the above propositions present all of the case necessary for us to consider in order to a correct decision on the merits.

The first and leading question is, was the complainant at any time, in legal contemplation, in the possession of the premises in controversy?

We understand by possession, in the connection, an adverse and an exclusive possession against all the world, claiming the property during the time, under an unrecorded deed, and such is the allegation in the bill of complaint.

And it is further alleged in the bill, that the complainant was put in possession of the lots, "on or about the 8th of November, 1845, by said Lewis W. Clark, and that she continued in possession from thence until about the 23rd of March, 1850, by actual residence thereon."

The proof that the house in which she resided, was built on the lots by Lewis W. Clark, is clear and unequivocal, and that he designed it as a home for his aged parents, and for the complainant, his sister, who had then passed her climacteric, unmarried, and with no prop of support, but her kind-hearted and generous brother, is equally conclusive.

A brief history of this family may tend to illustrate the character of this possession now set up by complainant. Previous to their removal to Chicago, it seems they were residing at Utica, New York. Whilst living there, the old gentleman was not known to do anything for a living, and he had been heard to say that he was supported by his son Lewis. In 1836, Lewis, it seems, brought his parents and family to Chicago, to take care of them, as he always declared. He first rented a house for them, called in the pleadings, the Hubbard House, where they resided three years. The family then consisted of his father and mother, the complainant, another brother who died in that house, and his son, a lad. He paid the rents and furnished for

the most part, the family supplies. Lewis was the head of the family, to whom all seem to have looked for support and protection. He was then engaged in trade in Chicago, but embarassed in his circumstances and driven to many expedients to meet his engagements. His difficulties of this nature, would appear to have been such, as to have overwhelmed and discouraged an ordinary man, but he seems to have been one of very considerable energy—of some financial ability, and in whom the organ of hope was largely developed. The father's name was Humphrey.

We hear nothing in particular of the parties, or of their tenor of life until they removed from the "Hubbard House" to the Clark Street House, being the premises in controversy. Having possessed himself, in 1842, of a contract with the agent of the owner, for the purchase of six lots in block 22, on the north side of the river and beyond the then improved part of the city, he, in August, 1843, executed a deed for three of these lots to the complainant, who kept it in her possession, never letting any member of the family, who were sworn as witnesses on her part, see it, or declaring to any of them she held a deed, until in March, 1850, after a disagreement with her brother and his family, and who had required her to leave the house, she placed the deed on record. In 1845, Lewis inclosed the six lots with a fence—set out shade trees gathered from the forest, and erected a neat dwelling-house, occupying part of three of the lots, declaring at the time, that it was for his father and mother to live in, who accordingly, with the complainant, were removed by Lewis from the "Hubbard House" to the house erected on these lots, though then in an unfinished state. Previous to this, Lewis had married and occupied, with his wife, a house on Michigan Avenue, known as H. O. Stone's, supporting, as it would appear from the testimony, his father's family living in the Clark Street House. In 1847, the father, Humphrey Clark, died in the house, and between his death and the death of the mother in 1849, Lewis going East with his family in the spring of 1849, broke up house-keeping on the Avenue, sold off some of his furniture, sent other portions to his mother's, on Clark street, and finally, removed there himself, bringing his wife with him on her return from the East. This was in the autumn of the year 1849. Soon after the mother died and the complainant remained in the family of Lewis until the spring of 1850, when in consequence of a serious quarrel with her brother and his wife, he desired complainant to leave the house ; that she should never live under the same roof with him and his wife, but should never want while he lived. He told her to go and get a house and he would pay

the rent. She swore at him and told him to go and get it himself. He accordingly got a house for her, but not being agreeable to her he got another, to which she repaired, after destroying some shrubbery she had planted about the house, declaring that Mrs. Clark should not enjoy anything she planted in the way of shrubbery. It seems her conduct in the house was so violent as to cause Mrs. Clark to faint. About this time she exhibited to Mr. Morris, one of the defendants, the deed of 1843, and asked his opinion if it was worth anything to her, all of which he details in his answer. After Lewis had built the house, pressed by his debts, he assigned in July, 1846, the contract of purchase of these lots to M. D. Ogden, as security for a certain debt of which Ogden had the collection, and in January, 1847, further assigned it to E. W. Tracy, together with the buildings on the lots, subject to the trusts in the assignment to M. D. Ogden. Bushnell, the trustee under this assignment in 1846, conveyed the lots by deed to W. B. Ogden, who, with Lewis W. Clark, on the 27th July, 1848, conveyed the lots in fee to I. H. Burch in trust, to sell and pay a certain debt due from Lewis to Corning & Co., of Albany, N. Y., and as security for other advances to be made by them to Lewis of merchandise in the way of his business. The debt not being paid to Corning & Co., on the 9th October, 1851, after due notice given, Burch, as trustee, sold the lots at public auction, at the door of the court house, in the city of Chicago, to B. S. Morris, he being the highest and best and only bidder, for the sum of $3,800, which he paid to the trustee, and a proper memorandum in writing made of the sale by him. Lewis was at the time of the sale absent, and Morris gave the trustee to understand, that he bought the property to secure himself, as he was under large liabilities for Lewis, but if Lewis on his return would discharge them, and the costs, with some compensation for his trouble and expenses, he intended Lewis should have the property again; that he did not design speculating on an absent friend. The trustee has not made a deed to Morris. Lewis still continued in possession of the property, paying no rent to Morris, and finally bargained and sold it to one Honore for over $20,000. Lewis died 31st March, 1855, leaving a wife and infant child, who, with Morris, W. B. Ogden, Burch, Corning & Co., and Honore, are made defendants to the bill. They severally deny all knowledge of possession of the premises by the complainant.

We have examined the record, voluminous as it is, with great care, on this point of possession of the premises by complainant, and making due allowances for the witnesses on her behalf, who for the most part, are her brothers and other relatives, who

presume to speak positively in relation to it, and comparing their testimony with undeniable facts in the case, and with that of others who are wholly disinterested, we think there is before us no satisfactory evidence of any possession by the complainant of this property. That she lived on it with her father and mother, who were both quite infirm, and incapable of exertion, and managed the household affairs, is undeniable, and that she set out with her own hands, some shrubbery, and beautified and adorned the place in some degree, is not to be denied. By the testimony of her own brother, who is not slow to speak in her behalf, Jonas C. Clark, the father, Humphrey Clark, was the head of the family while living on these premises, for he speaks of the family there residing, as "Humphrey Clark's family." This witness also swears that "it was universally conceded that complainant was not only in possession of the premises, but owned them,"—and again, "it was a matter of general notoriety in the city, among the entire circle of the acquaintance of the family, that complainant was in possession and owned the premises." He says, in this connection, that William B. Ogden, Gurdon S. Hubbard and Mahlon D. Ogden, were neighbors of Humphrey Clark, (again speaking of him as the head of the family,) from two to five years, but never saw but one of them, Hubbard, in the house. Now all these gentlemen are sworn, W. B. Ogden as one of the defendants, and the others as witnesses on their behalf, and they all deny this notoriety, and assert the contrary thereof; that it was Lewis W. Clark's possession and property, and G. S. Hubbard swears he had passed the house frequently, but was never in it. This witness, Clark, seems determined to believe the complainant was the owner, but he does not allude to any single act of ownership, nor that she claimed to have a deed, or occupied under any claim whatever. This wholesale swearing amounts to nothing, especially where stubborn facts are absent, or when present, speak a different language. Nor is any reliance to be placed on the testimony of Charles H. Clark, one of the witnesses of complainant, for the reason he betrays such an over anxiety, seeming to have no regard for his dead brother, the family's best friend and benefactor, as to lead to the suspicion that he has a secret interest in the property. He says she claimed to be in possession by virtue of the deed that had been previously given by Lewis to her, and the possession delivered by him to her. Other witnesses, entirely disinterested and not related to the parties say, that before the house was finished, Lewis removed his parents and family, of whom complainant was one, from the Hubbard House to the Clark Street House, and she was but an adjunct or member of the family. How does this witness know

of the deed ? He does not say he ever saw it, or that complainant even told him she had a deed. This witness speaks of occurrences in 1851, after the quarrel in 1850, when complainant was required to leave the house—speaks of an offer by Lewis to assign complainant a policy of insurance on his life for $3,000, if she would re-convey the property to him. He says after she went into the newly rented house, Lewis refused to pay the rent, and that she then took counsel. Lewis then advanced her something on her rent. He proceeds to say, " In 1853 he told ' *us* ' to rent a new house, and he became responsible for the rent, one hundred and eighty dollar house ; he paid her about one hundred and fifty dollars to defray expenses. In the spring of 1854 rents rose from eighty to one hundred per cent. Witness went to Lewis, and he said to witness from that time he would pay her rent and thirty dollars per month ; he did so until September of that year or thereabouts, when a proposition came from her brother to pay her an annuity of five hundred dollars if she would release her interest in the lots, which she refused. If it be true, as sworn by Mr. Morris in his answer, that this deed of 1843 was left with her under the circumstances stated, and to be canceled on the recovery of health by Lewis, and it would seem to be true, from the fact of her concealing it from the eyes of every one until after the quarrel in 1850, both complainant and her adviser, her principal witness in this case, have shown not only a want of good faith, but a heartlessness and ingratitude to a kind and generous brother, and a disrespect to his memory, a parallel to which, would be hard to find. Nothing detailed by any of the complainant's witnesses, prove such possession as should be notice to any one to put them upon inquiry. Something more is required than planting a rosebush or gathering vegetables.

At the time of the execution of the trust deed from Ogden and Lewis Clark to Burch, July 27, 1848, Humphrey Clark was dead, and his widow with her family, of whom complainant was one, was in the possession of the property and so remained, until the summer or fall of 1849, when Lewis with his family entered into possession, required the complainant to leave the house in the spring of 1850, and remained in the undisturbed possession of it until his death in March, 1855.

Something may be gathered from the fact, that in this quarrel with her brother Lewis and his family, she never alluded to her possessing a deed for the property which she was required to leave, nor did she set up any claim to it whatever, but took one house after another which her kind brother provided for her, thereby manifesting her continued dependence upon him though reproaching him for his rascality and for his want of respect to the

memory of his deceased father, by neglecting, with all his valuable property, to furnish a slab to cover his grave.

No possession then having been shown in complainant under an unrecorded deed or in any other legal and sufficient mode, no person can be chargeable with notice of any right she may have possessed. Nothing is shown sufficient to put any one upon inquiry even, certainly not when the trust deed to Burch was made in July, 1848, for at that time the mother was in possession, and all the facts of building the house, and the purpose for which it was originally built as a home for her, were matters of such general knowledge and notoriety as to preclude the idea of an ownership or claim of title in another member of the family, to be implied from planting shrubbery and ornamenting the grounds with flowers. It was no act sufficient to put any one on inquiry. But it seems by her own showing that she knew of these arrangements and conveyance to Burch. Why did she not give him notice of her claim through her unrecorded deed? Why suffer him to take such security for Corning's honest debt? Honesty required if she held a claim, that she should have disclosed it, and not having done so she ought to be estopped from setting it up against Burch or any one claiming under him. 1 Johns. Ch. 343. If complainant was exercising acts of ownership over it—leasing it—appropriating parts of it to her own exclusive use—listing it for taxation and paying taxes upon it, all these would be evidence of some claim which ought to put parties upon inquiry, but nothing of this kind appears. Lewis appropriated it to his own purposes—built a stable on one of the lots (14) without the knowledge of complainant—paid the taxes upon it, and was the acknowledged owner in the judgment of those best situated to know all about it, and who have testified without bias, prejudice, or partiality. There is nothing in the whole record going to show any different fact.

The circumstances attending the possession in 1848, when Burch took the deed from Ogden, and his presumed knowledge of them, do not evince a fraudulent turning away from a knowledge of the facts which the *res gesta* would suggest to a prudent mind. Cases of this kind must be examined by the light of all the surrounding circumstances, which have a tendency either to excite or check those inquiries to which it is the natural effect of notorious adverse possession to give rise. Planting a tree or shrub and gathering fruit, or giving directions about the location of a door, or the ornaments of the house, are not circumstances constituting such notice as to prompt inquiry.

That Lewis should have been desirous to arrange the claim the complainant so unexpectedly set up to the property, is not at all surprising. It is consistent with his whole conduct toward

her and his parents. He said when he told her to leave the house, that she should never want while he lived, and provided her most generously with a house and allowed her $360 a year in money. Few instances of greater fraternal kindness by one in his circumstances, overwhelmed with debt, and driven from one expedient to another, to keep his head above water, he yet has his sister in his mind, and amid all his disasters, determines to provide for her, and does so.

The consideration of this point, going as it does to the very foundation of complainant's equity, disposes of all the minor points.

It must be borne in mind, that Lewis Clark was, during all this time, and to the day of his death, largely in debt, and so far as ready means were concerned with which to meet them, insolvent. No consideration whatever being shown for the deed to the complainant, it was voluntary on his part, in fraud of creditors and void. It was not a *bona fide* transaction but shall be intended as designed to defraud creditors. *Townsend* v. *Windham*, 2 Vesey, 10 ; 1 Story's Eq. Jurisprudence, 384, and notes.

There is another consideration connected with this case which should have some bearing upon the rights of parties here. This voluntary deed was made but a few days before the marriage of Lewis and without the knowledge of his intended wife. Of this marriage there is issue, an infant of tender years. The design to possess this property, in total disregard of the rights these new relations have created, is fraught with so much injustice, as to entitle it to no support in any quarter, for although Morris is entitled to the legal estate, it is evident from his answer and repeated declarations, that he holds it only as a means of being reimbursed his advances and protected in his liabilities for Lewis—the balance to go to the benefit of the estate of Lewis.

All the defendants, Ogden, Burch, Corning & Co., Honore, and Morris, all deny any kind of notice actual or constructive, of this claim of complainant, now for the first time set up, nor is there any sufficient proof of an open, notorious, exclusive and adverse possession.

We think it has no foundation to support it, and affirm the decree of the Circuit Court. It is wholly unnecessary to examine other questions made in the argument of this case. They all resolve themselves into this one of possession and the supposed equitable notice growing out of it.

*Decree affirmed.*